IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA

In re:

 KATRINN BOWDEN MEEKER  BANKRUPTCY CASE:

 Debtor  10-04927 MAM

  CHAPTER 13

=========================================================

 KATRINN BOWDEN MEEKER

  Plaintiff,

vs.  Adversary Proceeding Number:

  11-00040-MAM

 SIROTE & PERMUTT, P.C.,
 LENDER PROCESSING
 SERVICES, INC., LPS DEFAULT
 SOLUTIONS, LLC

  Defendants,

=========================================================

**PLAINTIFF'S CONSOLIDATED RESPONSE TO THE MOTIONS FOR SUMMARY JUDGMENT FILED BY ALL DEFENDANTS IN THIS ACTION (ECF DOCS 13 & 16)**

1

Comes now the Plaintiff in this matter, by and through counsel, and responds to the summary judgment motions filed by the defendants Lender Processing Services, Inc.("LPS") and LPS Default Solutions "LPS Default" (ecf doc 13) and the defendant Sirote and Permutt, P.C. ("Sirote") (ecf doc 16) as follows:

## **DEFENDANTS' MOTIONS ARE PREMATURE**

Pursuant to the Federal Rules of Bankruptcy Procedure, Rule 56 of F.R.C.P. applies in this adversary proceeding and to Defendants' Motions for Summary Judgment[1]. While it is in Defendants' right to move for summary judgment prior answering the complaint or engaging in discovery[2], it is certainly not common. The case law that has developed around Rule 56 generally stands for the proposition that motions for summary judgment filed before discovery is taken should be granted "in only rarest cases" See Miller v. Wolpoff & Abramson, L.L.P. 321 F. 3d 292, 303-04 (2d Cir. 2003) cert. denied, 540 U.S. 823, 124 S. Ct. 153, 157 L. Ed. 2d 44 (2003). Also, that a grant of summary judgment prior to discovery should be granted "only in the clearest of cases". Patton v. General Signal Corp. 984 F. Supp. 666, 670 (W.D.N.Y. 1997)

In order to defeat a properly supported motion for summary judgment, the adverse party must show "specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). However, the rule also dictates that discovery be allowed prior to deciding motions for summary judgment:

> Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.[3]

This provision qualifies the requirement on the adverse party and requires that "summary judgment be refused where the nonmoving party has not had the opportunity to discovery information that is essential to his opposition. The affidavit and composite exhibits attached as Exhibit A, filed by Plaintiff's counsel Nick Wooten clearly shows that general fact issues are in dispute in this case and that Plaintiff needs additional information through discovery in order to properly and fully respond to Defendants' motions.

The Fifth Circuit, in precedent binding on the Eleventh Circuit, described the approach courts should take in application of this rule, saying "Where . . . the party

---

[1] http://www.uscourts.gov/uscourts/RulesAndPolicies/rules/2010%20Rules/Bankruptcy%20Procedure.pdf
[2] Brill v. Lante Corp., 119 F. 3rd 1266, 1275 (7th Cir. 1997)
[3] Fed.R.Civ.P 56(d) formerly 56(f)

2

opposing summary judgment timely presents his affidavit under Rule 56(f) [now Rule 56(d)] stating reasons why he is presently unable to proffer evidentiary affidavits he directly and forthrightly invokes the trial court's discretion. Unless dilatory or lacking in merit, the motion should be liberally treated." Walters v. City of Ocean Springs, 626 F.2d 1317, 1321 (1980) (internal citations omitted).

The Eleventh Circuit summarized the Supreme Court precedent governing summary judgment in Snook v. Trust Company of Georgia Bank of Savannah:

> The Court addressed the burden to be placed on the nonmoving party as follows: "In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

859 F.2d 865, 870 (1988). Quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265, 273 (1986) (emphasis added by Eleventh Circuit). See Also, Alabama Farm Bureau Mutual Casualty Co. v. American Fidelity Life Insurance Company, 606 F.2d 602, 609 (5th Cir. 1979); Parrish v. Board of Commissioners of the Alabama State Bar, 533 F.2d 942, 948 (5th Cir. 1976); Littlejohn v. Shell Oil Co., 483 F.2d 1140, 1145 (5th Cir. 1973).

In Snook, the court went on to discuss the application of this precedent in the Eleventh Circuit:

> This court has often noted that summary judgment should not be granted until the party opposing the motion has had an adequate opportunity for discovery…Generally summary judgment is inappropriate when the party opposing the motion has been unable to obtain responses to his discovery requests. Id. (internal citations omitted).

Similarly in Cowan v. J.C. Penney Company, Inc., the Eleventh Circuit overturned the district court's entry of summary judgment, because they found that the party opposing the motion had properly brought to the district court's attention the fact that there was still outstanding discovery. 790 F.2d 1529, 1532 (11th Cir. 1986). See also, Doe v. Abington Friends School, 480 F. 3d 252, 257 (3d Cir. 2007), which states that it is ""well established" that [an] opposing party must be given [an] "adequate opportunity to obtain discovery"".

### PLAINTIFF'S COUNSEL'S AFFIDAVIT MEETS THE REQUIREMENTS NECESSARY TO POSTPONE A RULING ON SUMMARY JUDGMENT

Rule 56(d)[4] provides a mechanism by which the Court may postpone a ruling on summary judgment when the nonmovants provide (1) a description of the particular discovery that they seek (2) an explanation of how that discovery would preclude an entry of summary judgment (3) a statement justifying why this discovery has not been or could not be obtained earlier. See Adams v. Travelers Indemnity Co. of Connecticut, 465 F. 3d 156, 162 (5th Cir. 2006). Plaintiff's counsel has attached an affidavit to this response, which meets the elements set out above which would allow the Court to, at a minimum, postpone Defendants' Motions until after discovery has been conducted.

Pursuant to Rule 56(d), Mr. Wooten's affidavit describes the particular discovery sought, an explanation of how the particular discovery will preclude an entry of summary judgment, and a statement of why this discovery has not been or could not be obtained earlier. (See Exhibit A). This information alone justifies a postponement of a ruling on summary judgment. It is important to note that as recently as March Defendants LPS, LPS Default, and Plaintiff's counsel were involved in an almost identical case filed in the Northern District of Mississippi, *Thorne v Prommis Solutions Holding Corp et al, case number AP-10-01172-DWH (*hereinafter referred to as "Thorne"). In Thorne, Defendants also filed similar pre-discovery summary judgment motions. Consistent with the case law cited supra, Judge Houston postponed ruling on the Defendants' motions and permitted plaintiffs to conduct discovery, which is ongoing because of the defendant's refusal to cooperate with discovery in that action. Plaintiff requests a similar opportunity here. A copy of the order in Thorne is attached as Exhibit B to this motion.

### PLAINTIFF'S AFFIDAVIT DEMONSTRATES THE EXISTENCE OF GENUINE ISSUES OF FACT NECESSARY TO DEFEAT ANY MOTIONS FOR SUMMARY JUDGMENT

The Plaintiff's affidavit provides important, relevant information regarding the misconduct alleged in this case, which give rise to genuine issues of material fact, which should only be resolved at trial. These facts, which are addressed in further detail in Mr. Wooten's affidavit, include the following:

1. The exhibits to plaintiff's complaint detail the nature of the arrangements between the defendants and the nature of the conduct complained of in the complaint.

2. The plaintiff has also attached to this motion further evidence which points to an ongoing relationship between and among the Defendants.

3. Furthermore, what is of greater importance to the Court is the fact that the defendants do not deny, and cannot deny, the existence of this relationship between them and the conduct complained of in the complaint, rather the defendants simply hope to lead the Court

---

[4] Rule 56(f) was renumbered to Rule 56(d) in the 2010 amendments to the Federal Rules.

to believe that they did not engage in the suspect conduct *in this case*.

4. The undersigned also submits for the Court's consideration certain evidentiary submissions, which contradict the assertions of LPS and LPS Default in their motion for summary judgment, which is filed in this case.

5. LPS and LPS Default's 2009 annual report filed under oath with the Securities and Exchange Commission by LPS in pertinent part this filing sets forth the following:

> "we derive a significant portion of our aggregate revenue from our largest customers. For example, in 2009, our two largest customers, Wells Fargo Bank, N.A. ("Wells Fargo") and JPMorgan Chase Bank, N.A. ("JPMorgan Chase"), each accounted for more than 10% of our aggregate revenue and more than 10% of the revenue from each of our Technology, Data and Analytics and Loan Transaction Services segments" (Page 19 of 158).

6. The annual statement also explains that part of LPS' Loan Transaction Services includes default management services as follows:

> *Default management services.* In addition to loan facilitation services, our Loan Transaction Services segment offers default management services. These services allow our customers to efficiently manage the business processes necessary to take a loan and the underlying real estate securing the loan through the default and foreclosure process. We offer a full spectrum of services relating to the management of defaulted loans, from initial property inspection through the eventual disposition of our customer's asset.

7. As further evidence of the relationship between Wells Fargo and LPS, Plaintiff refers this Court to LPS' 2010 Annual Statement, which LPS filed under oath with the Securities and Exchange Commission. In pertinent part, this document provides the following admissions against interest that contradict the affidavit of Mr. Cloin:

   a. Beginning at Page 1 of the Annual Report: *"Our other technology solutions include our Desktop application, which at present is deployed primarily to customers utilizing our default*

5
Case 11-00040    Doc 23    Filed 06/14/11    Entered 06/14/11 17:45:21    Desc Main
Document      Page 5 of 12

*management services. We generally earn revenues from our Desktop application on a per transaction basis.*

b. Beginning at page 2 of the Annual Report: *Our Loan Transaction Services segment consists principally of our loan facilitation services and our default management services.... Our default management services, including title, posting and publication, property preservation, asset management and REO auction services and administrative support, are provided to national lenders, loan servicers and other real estate professionals to enable them to better manage some or all of the business processes necessary to take a loan and the underlying property through the default, foreclosure and disposition process. Our revenues from our Loan Transaction Services segment in 2010 were $1,701.5 million, or approximately 69%, of our consolidated revenues.*

c. Under the heading of "Loan Transaction Services" (which begins at the end of page 3) of the annual report the Court will find the following statement that is located on page 4 of the annual report: *Default management services.* In addition to loan facilitation services, our Loan Transaction Services segment offers default management services.[5] These services allow our customers to efficiently manage the business processes necessary to take a loan and the underlying real estate securing the loan through the default and foreclosure process. We offer a full spectrum of services relating to the management of defaulted loans, from initial property inspection through the eventual disposition of our customer's asset. Based on a customer's needs, our default management services can be provided individually or, more commonly, as part of a solution that integrates one or more of those services with our technology applications, such as the Desktop application.

d. Under the heading of Customers, the Court will find this statement: *"For example, in 2010, our largest customer, Wells Fargo Bank, N.A. ("Wells Fargo"), accounted for approximately 20.0% of our aggregate revenue and approximately 12.2% and 23.3% of the revenue from our Technology, Data and Analytics and Loan Transaction Services segments, respectively."*

---

[5] The Court will recall that the DSA says at page 3 of 70 that "Option One desires to enhance its overall servicing capabilities by capitalizing on Fidelity's expertise in managing defaulted and bankrupt loans…" among other statements that agree with this Annual Report.

8. Factual evidence exists to contradict Defendant LPS' Motion and the affidavit filed by Michael Cloin. Mr. Cloin attempts to claim to the Court that LPS was not involved with the Meeker loan. This affidavit misrepresents to the Court the nature of the contractual relationships with LPS and its mortgage servicing customers and its "network firms."

9. As set out in the supporting affidavit of Mr. Wooten and as attached here as exhibit C to this motion, these defendants attempted and were successful in misleading Mr. Wooten in a prior case in Alabama by making such an assertion which later proved to be false.

10. Further, the plaintiffs have attached to their complaint at ECF Doc 1-3 the deposition testimony of this defendant through its corporate representative, William Newland, which soundly refutes the affidavit of Mr. Cloin by demonstrating that for those mortgage servicers such as Wells Fargo who contract with LPS to manage their default services that LPS Default manages ALL of their loans. The relevant testimony is included as follows:

> newland61609 - Vol. I, (Pages 150:21 to 152:4)
>
> 150
> 21  Q  I'm sorry. Option One does not pay --
> 22  A  That's correct.
> 23  Q  -- LPS Default Solutions any money?
> 24  A  That's correct.
> 25  Q  You did indicate that LPS Default Solutions
>
> 151
> 1  charges an administrative support fee to the attorney
> 2  who is the network attorney assigned to the
> 3  foreclosure?
> 4    A  Yes.
> 5    Q  What we were trying to establish at the
> 6  point in time we had to take that break was how is
> 7  that fee determined, and I think you indicated that it
> 8  was a flat fee?
> 9    A  Yes.
> 10   Q  And that it was -- is it based upon the fee
> 11  that the attorney charges, or is it --
> 12   A  No.
> 13   Q  -- based upon some other factor?
> 14   A  It's just based on the services we provide
> 15  with the attorney.
> 16   Q  Okay. And so is there a fee for separate

7

17  services which LPS Default Solutions provides?
18     A  No.  We're contracted with the attorney.
19     Q  So every fee which LPS Default Solutions
20  charges would be contained in the agreement between
21  LPS and Scott Humphrey?
22     A  That's correct.
23     Q  And every fee or payment due from Option One
24  to LPS Default Solutions would also be contained
25  within the contract that was executed between those
152
 1  parties?
 2     A  There's no fee between Option One and LPS.
 3     Q  Never under any circumstances?
 4     A  No.

newland61609 - Vol. I, (Pages 154:8 to 156:9)
                                        154
 8  Q   Does LPS Default Solutions have any
 9  agreement with any provider of services who does
10  charge a fee to a consumer in the foreclosure process
11  whereby that fee is shared with LPS Default Solutions?
12     A  No.
13     Q  And your testimony is that never happens,
14  not with respect to any fee, including any attorney's
15  fee?
16     A  No.
17     Q  Does Fidelity charge to Option One -- I'm
18  sorry.
19        Does LPS Default Solutions charge to Option
20  One any amount of money at any time for referring a
21  foreclosure file for foreclosure services through the
22  LPS Default Solutions platform?
23     A  No.
24     Q  Does it receive any remuneration of any type
25     from  any  source  for  Option  One  uploading  a foreclosure

                                        155
 1  to LPS Default Solutions?
 2     A  No.
 3     Q  So I just want to be sure.  What you're
 4  testifying to is that there is no compensation ever
 5  paid by the servicer to LPS Default Solutions for all
 6  this work that it does on behalf of the servicer with
 7  respect to the foreclosure?
 8     A  No.

```
 9    Q   There is compensation or there is not
10   compensation?
11    A   No, there's no compensation.
12    Q   Is it your testimony then that the only fees
13   which LPS Default Solutions collects with respect to
14   the foreclosure of any given loan is the
15   administrative support fee charged to the network
16   attorneys?
17    A   Yes.
18    Q   And the division of LPS Default Solutions
19   which we are here about today and which you are
20   testifying as a 30(b)(6) representative, the only
21   source of income it derives for its work with respect
22   to foreclosure is the administrative support fee?
23    A   That's my understanding.
24    Q   Other than the administrative support fee,
25   does it charge a fee for accessing documents on the

                              156
 1   new document system?
 2    A   No.
 3    Q   So your testimony today is that the only
 4   compensation of any type, of any nature, paid to LPS
 5   Default Solutions is the administrative support fee,
 6   and it funds all of the activities and makes all the
 7   profit, pays all the overhead of LPS Default
 8   Solutions?
 9    A   That's my understanding, for the third time.
```

11. As the preceding testimony of Mr. Newland indicates, LPS derives all of its income for these services by splitting fees with the law firms such as Sirote, who perform the bankruptcy and foreclosure services.

12. Further, the attached affidavit of counsel offered in support of this response sets out that he has supplemented the exhibits to the complaint to include a copy of the default services agreement which is not confidential between Option One (now American Home Mortgage Servicing, Inc.) and Fidelity National Foreclosure and Bankruptcy Solutions (now LPS Default).

13. Mr. Wooten's affidavit sets out that the Default services agreement between the servicers such as Wells Fargo and LPS Default provide that the servicers refer ALL matters to LPS Default for foreclosure and bankruptcy processing. According to Mr. Newland the process of referral is automated by the software and

9
Case 11-00040    Doc 23    Filed 06/14/11    Entered 06/14/11 17:45:21    Desc Main
                          Document      Page 9 of 12

there is no human discretion in determining whether or not Wells Fargo's loans get referred to LPS Default. newland61609 - Vol. I, (Pages 201:4 to 202:9)

14. Further, in exchange for referring those matters to LPS Default for foreclosure and bankruptcy processing, the servicers agree to pay the attorney fees which LPS Default negotiates for the network firms and which are attached to the default services agreement as a schedule thereto.

15. In addition, LPS boasts that Wells Fargo is its largest customer in its 2010 annual statement and is responsible for roughly 20% of the entire annual income of LPS. The 2010 annual statement of LPS indicates that Wells Fargo utilizes LPS for both non-defaulted loan management and defaulted loan management. LPS' filings indicate Wells Fargo is its largest client in each category. The Court will also assuredly note that the SEC filings are now made under penalty of perjury pursuant to the Gramm-Leach-Bliley Act.

16. The Court can confirm that this relationship has existed through the review of the decisions by the Hon. Elizabeth Magner in the cases known as *In re Jones* and *In re Stewart* which both deal with LPS' relationship with Wells Fargo.

17. In fact, in the *Stewart* decision, Judge Magner quotes heavily from the testimony of one Kim Miller, who was in charge of bankruptcy servicing for Wells Fargo at their Fort Mill, S.C. loan servicing facility. In that testimony Kim Miller explains that Wells Fargo uses LPS to manage its bankruptcy loans and explains that process to the Court in some detail.

18. The litigation that began with *In re Jones* in the Eastern District of Louisiana in 2006 led to the ultimate findings in the recently published case of *In re Wilson* where Judge Magner found that LPS had committed fraud upon her court in the manner in which LPS submitted default affidavits in support of its mortgage servicer clients.

19. The defendants have been known to have an ongoing business relationship with Wells Fargo for a number of years listing Wells Fargo as one of its largest customers in its annual statements since its first SEC filings in 2008.

20. Furthermore, in evidence of the fact that this relationship is ongoing, Mr. Wooten attaches to his affidavit recent filings made by Wells Fargo in the ongoing contempt proceedings in the State

of New Jersey titled "**In the Matter of Residential Mortgage Foreclosure Pleading and Document Irregularities, in the Superior Court of New Jersey, Chancery Division-General Equity Part, Mercer County, Docket No. F-59553-10.**" The respondents will not repeat verbatim the contents of the affidavit but these documents are Wells Fargo's own internal documents and clearly demonstrate its ongoing relationship with LPS and Sirote and Permutt.

21. Additionally, as part of this response, plaintiff's counsel uncovered a patent application related to a software product used by one of nation's largest LPS Network Firms that details a "wrap-around" technology that allows the Vendorscape technology to pull its data directly from LPS Desktop. This type of integration is supported by the other evidence submitted in this case including Wells Fargo's own documents. That patent application is attached as Exhibit D to this motion.

22. Based upon Wells Fargo's recent filings in New Jersey and the affidavit of Sirote and Permutt in this case, it appears that Wells Fargo has adopted the use of Vendorscape to "wrap around" LPS Desktop just as the patent application sets forth. Therefore, it is logical to infer that LPS is now working with Vendorscape to allow its interface with the LPS Desktop product.

23. Given the manner in which LPS has assiduously attempted to avoid inquiry into its ongoing fee splitting relationships it is perfectly logical that LPS would allow this wrap around technology to give the appearance that its "network firms" are detached from direct referrals while the referral is actually taking place within the Vendorscape system through the use of this "wrap around" technology which has the effect of "cloaking" the direct nature of this referral by LPS Default.

24. Mr. Wooten's affidavit contends that discovery in this case will show that as a matter of contract this loan was managed by LPS Default and that fees were split with LPS improperly by the remaining defendants.

25. Further, to the extent that the Defendant Sirote attempts to distance itself from its business "partner" LPS, the plaintiff has attached significant evidence of that ongoing relationship including documents showing that Sirote is a top performing LPS Network Firm, having been recognized and given awards for providing the most quality and timely service to LPS very recently.

Premises considered, the Plaintiff moves that Your Honor postpone any time to respond to the summary judgment motion until such time as the Plaintiff may take discovery in this matter and request that the Court set this case for a status conference so that the Court might take early control over the case management process in this matter.

Respectfully submitted this 14th day of June 2011.

>*/s/ Nick Wooten*
>Lead Counsel for the Plaintiff
>P.O. Box 3389
>Auburn, Alabama 36831
>334 887 3000
>334 821 7720
>nhwooten@gmail.com
>Lead Counsel for the Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the foregoing upon counsel of record for the parties and the US Trustee on this the 14th day of June 2011 by use of the ECF system.

Hon. Jeffrey Hartley, Esq.
Helmsing, Leach, Herlong, Newman & Rouse, P.C.
Post Office Box 2767
Mobile, AL 36652
(251) 432-5521
(251) 432-0633 Fax

Eris Bryan Paul, Esq.
Bob Girardeau, Esq.
Huie, Fernambucq & Stewart, LLC
Three Protective Center
2801 Hwy 280 S Suite 200
Birmingham, AL 35223-2484

>*/s/ Nick Wooten*
>Lead Counsel for the Plaintiff