# Exhibit A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**

**In re:**

**Katrinn Bowden Meeker, Debtor**

**BANKRUPTCY CASE: 10-04927 MAM**

**CHAPTER 13**

===

**Katrinn Bowden Meeker, Debtor**

**Plaintiff,**

**vs.**

**Adversary Proceeding Number:**

**SIROTE & PERMUTT, P.C.,**
**LENDER PROCESSING SERVICES, INC.,**
**LPS DEFAULT SOLUTIONS, LLC**

Defendants,

===

PLAINTIFFS' AFFIDAVIT IN SUPPORT OF THEIR RULE 56(d) MOTION BY NICHOLAS WOOTEN

===

**STATE OF ALABAMA** )
) **AFFIDAVIT**
**LEE COUNTY** )

Before me the undersigned authority, a notary public, in and for said State and County, personally appeared **NICHOLAS WOOTEN**, who, being duly sworn by me, deposes and says under oath as follows:

1. My name is Nicholas Wooten. To those who know me well instead of my full name I am known as Nick Wooten. I am an attorney duly admitted to the practice of law in the State of Alabama and have personal knowledge of the facts contained in this affidavit.

2. I am engaged in the private practice of law in Lee County, Alabama at 1702 Catherine Court Suite 2-D, Auburn, Alabama 36832.

3. I have been retained as a member of the counsel team for the plaintiff in this action.

4. Over most of the last three years I have been involved in litigation with the defendants LPS and LPS Default Solutions.

5. LPS Default Solutions is formerly known as Fidelity National Foreclosure & Bankruptcy Solutions which was a division of Fidelity National Default Solutions. An exemplar cover sheet showing these former names is attached hereto as exhibit 1.

6. In the first case that I filed against these defendants I was contacted by their national attorney, Mr. Michael Cash, who called me at my office and claimed that I was mistaken in that matter and that LPS had no involvement in the loan which I had made claims against them in my lawsuit.

7. Mr. Cash said that he would provide me an affidavit from an Officer of LPS to that effect if I would agree to dismiss them from the case and that we could hash out our issues at a later date in another matter.

8. Mr. Cash provided me the affidavit of Mr. Scott Walters indicating that LPS was not involved in managing that loan on LPS' system. As a result of that affidavit I amended my complaint and dismissed my claims against LPS in that matter before they answered. I have attached the affidavit of Scott Walter as exhibit 2 to my affidavit in this case.

9. The affidavit provided by Mr. Cash from Mr. Walters later proved to be false.

10. When I continued the litigation against the remaining defendants I deposed the 30b6 representative of the servicer many months later. Her name was Daphne Mosley and she testified thusly regarding LPS' involvement in the loan:

Mosley, Daphne, (Pages 8:18 to 9:8)

8

Q. Okay. Does your -- to the best of your knowledge, does your firm contract directly with local attorneys for these services or does your firm work through an outside provider, such as Lender Processing Services?
MS. BEARDSLEY: Object to the form. I'm just objecting to the form of the question. You can answer, if you know.

9

A. They use outsource providers.
Q. (BY MR. WOOTEN) And one of those outsource providers is a company that used to be known as Fidelity National Information and Bankruptcy -- or Foreclosure and Bankruptcy Services. It's now known as Lender Process Services. They call it LPS Default; is that correct?
A. Yes.

11. I have attached Ms. Mosley's deposition to this affidavit as exhibit 3 for the Court.

12. Later, after I, along with my counsel team, instituted suit in the Northern District of Mississippi in the Adversary Proceeding styled *Thorne v. Prommis Solutions Holding Corp., et al, case number AP-10-01172-DWH*, we were confronted with the affidavit of Mr. Ross Gloudeman, who similarly to Mr. Walters, claimed the LPS had no involvement in the administration of the loan in the Thorne case. LPS also moved for a pre-answer summary judgment in the *Thorne* matter as well. The Gloudeman affidavit is attached hereto as exhibit 4 to this affidavit. A copy of my motion to strike that affidavit is attached as exhibit 5 to this filing.

13. In this matter, Mr. Cloin makes nearly identical claims to Mr. Walters and Mr. Gloudeman. These gentlemen, in each instance, make these affidavits in the face of substantial evidence that their assertions are false. This appears to be the litigation strategy of these defendants and this strategy appears to be aimed at stopping any Court from inquiring into the propriety of the actual conduct being undertaken in bankruptcy courts all over the country by these defendants.

14. For the Court to fully appreciate why it is likely these affidavits are untrue, it is important to understand how the contracts between these parties actually function.

15. As between the mortgage servicer and LPS Default Solutions there is one contract which is referred to as a Default Services Agreement or "DSA".

16. I have attached a supplemental exhibit to the Plaintiff's complaint at ECF 10-1 a non-confidential exemplar of the DSA. This particular DSA is between Option One now known as American Home Mortgage Servicing, Inc. and Fidelity National Foreclosure & Bankruptcy Solutions now known as LPS Default Solutions.

17. I have personally taken testimony from LPS in other matters that this document is a standard form contract and I have personally reviewed multiple DSA's which are protected by various confidentiality agreements.

18. Each DSA I have reviewed contains the same headings, terms and definitions that are found in this exemplar DSA. Therefore, it is my belief that every DSA in existence between LPS Default Solutions and its mortgage servicing clients contains these same generic terms with only the schedules attached to the DSA being different as between servicers. The Schedules are primarily concerned with the pricing of the services.

19. The DSA contains several articles in the standard terms. Article 1 is titled "Definitions, Documents and Overview". Section 1.1 begins at page 3 of 70 and is titled "General Definitions". Within this section the Court may find the standard definitions of the standard terms of this agreement.

20. The definition of "Agreement" refers to the DSA.

21. The Court would likely be interested in the definitions of "Fidelity Network" and "Fidelity Network Agreement" found at page 4 of 70.

22. This definition provides that the "Fidelity Network" means a nationwide network of natural persons, law firms, foreclosure trustees, professional organizations and third party entities (hereinafter collectively "Law Firm" or "Law Firms"), selected by Option One, at Option One's discretion, and ***retained and managed by Fidelity*** to handle Foreclosures or otherwise provide Services in accordance with the terms and conditions of this Agreement and Schedule A.

23. "Fidelity Network Agreement" means the service level agreement between Fidelity and the Fidelity Network Law Firms.

24. "Operating Procedures" means the procedures governing the performance of the Services.... The Operating Procedures, as amended, shall then govern the performance of Services from that point forward, regardless of when or whether the amendments are entered on the FNDS online reporting website.

25. "Referral File" means a file respecting a Referred Loan and containing such documents and / or information which are necessary, as reasonably determined by Fidelity or applicable servicing guidelines, to accomplish a Foreclosure, ***bankruptcy action***, or related matter respecting such Referred Loan.

26. The DSA also provides in Section 2.1(a)(i) that Fidelity will "provide the services to Option One in accordance with this Agreement" and that "All Referred Files shall be processed exclusively through the Fidelity Network....

27. Section 2.2 provides that Fidelity will provide the services in compliance with Schedule A and the Operating Procedures. Schedule A may be changed upon mutual agreement by the parties in writing.

28. Section 2.5 of the DSA ***requires*** the servicer to select a law firm who has executed a "network agreement" with Fidelity and "Fidelity shall be responsible for managing Fidelity Network Law Firms". This section goes on to provide that "Prior to performing any services, all Network Firms must have entered into the Network Agreement, and the Option One [Servicer] Local Counsel Agreement (the "LCA") directly with Option One [the servicer]. The LCA is attached to the DSA as Exhibit B.

29. Section 3.3 of the DSA states that both Option One and Fidelity agree not to disclose the DSA outside of their respective organizations without the prior, written permission of the other party.

30. Section 5.4(e) of the DSA is a representation and warranty of Fidelity to Option One that it is not the subject of investigation or litigation relating to claims that Fidelity is involved in (i) the unlawful referral of foreclosure, bankruptcy, or eviction matters, (ii) the unauthorized practice of law, and / or (iii) unfair or deceptive trade practices in the provision of the services set forth in the agreement.

31. In Schedule B to the DSA, beginning at page 25 of 70, the document sets forth those fees to be paid for the services that Fidelity and its "network firms" are to perform. Beginning on page 29 of the document the fees that are charged for bankruptcy work is listed.

32. In schedule A of the DSA (page 37 of 70) Fidelity agrees that it shall perform the following non-exhaustive list of tasks for the servicer related to bankruptcy:

a. Refer imaged documents and cover sheet to local counsel (which initiates the foreclosure proceeding).
b. Commence required action referral.
c. Assist local counsel in the preparation and submission of proofs of claim and obtain / manage fees and costs process for the purpose of filing the proof of claim.
d. Assist local counsel in its review of bankruptcy plans and objection to bankruptcy plans.
e. Execute standard documents on the servicer's behalf.
f. Provide timeline management.
g. Execute declarations in support of motions for relief.
h. Refer agreed order default referrals to law firms
i. Transfer files from foreclosure to bankruptcy and from bankruptcy to foreclosure with NewTrak.

33. Option One pays no money to Fidelity for the provision of these services, instead, Fidelity earns all of its income from the fees paid to it by the attorneys from the attorneys fees earned by the attorneys. William Newland 61609 - Vol. I, (Pages 150:21 to 152:4) and (Pages 154:8 to 156:9) (ECF Doc 1-3)

34. Additionally, according to Schedule B of the DSA (ECF 10-1 page 40), in the first recital Fidelity (now LPS) states it ***"has agreed to perform various legal services*** for Option One (its mortgage servicing clients) that include….. bankruptcies……. (the "Services")" through the terms of the DSA.

35. The pricing for those services related to bankruptcy can also be found at page 51 of 70 of ECF doc 10-1. The Court may compare those prices to the prices found in the network agreement's list of charges and find that they are similar. The network agreement is found at ECF 1-4. When the Court has possession of the DSA's and Network Agreements for each servicer the Court will find that the fees in the DSA are identical (by servicer) to the fees in the network agreement. In fact, LPS has previously testified that LPS negotiates the fees for its network firms through the terms of the DSA.

36. The details of the network agreement are set out in great detail in the complaint (ECF 1) at paragraphs 51 through 88, 89-130 as well as ECF 1-4 which is the network agreement exemplar attached to the complaint.

37. Therefore, by reviewing the terms of the DSA, which is a form contract, and the network agreement, which is also a form contract, along with the

explanatory deposition testimony of Bill Newland, the Court may infer from the evidence already presented in the plaintiff's initial pleadings that these parties have an express "quid pro quo" agreement for the referral of legal matters for a fee. This conduct has occurred ***thousands of times*** in this Court since this behavior began.

38. This conduct and these contractual agreements have created the opportunity for LPS Default Solutions, through its relationship with Sirote and Permutt, P.C., to dominate the docket in Your Honor's courtroom and harvest millions of dollars in fees for which it has never sought this Court's approval and which it has never disclosed.

39. Additionally, LPS Default Solutions has given sworn testimony about this referral process and how it works as well as the financial arrangements in question.

40. The process of transferring the files from the servicer's computer system to the system that LPS uses called "LPS Desktop" is referred to by LPS in its testimony by the term "push" as explained in this excerpt of William Newland's testimony as LPS' corporate representative:

newland61609 - Vol. I, (Pages 201:4 to 202:9)

201

Q That would have been some of the documents which would have been prepared or which would've been retrieved through the automated processes of your software, your Process Management software, right?
A It would've been retrieved based off of the push from Option One on the documents.
Q So your software would've made the request and they would've responded with their original documents --
A That's right.
Q -- or scans --
A They would push the documents to us.
Q Sure.
A To our imaging system.
(Brief interruption.)
THE WITNESS: To our imaging system.
BY MR. WOOTEN:
Q So those documents would've -- would be part of what was identified, we would be able to look back to your imaging system at the date in the documents and pick that information out, right?
A Yes.

202

Q It looks like those documents would've been pushed by Arvind Kumar on 6/4/07, at Entry 150 is where they were explained.

You have a corresponding entry numbered 67471979 that says it is the note and says that it consists of eight pages on 6/5/07 at 5:42 a.m., and it says it was uploaded by an automated process. Does that sound right?

A Sounds correct.

41. This deposition is attached to the Plaintiff's complaint as ECF Document 1-3.

42. Because this action is completely automated by the software the assertion that the Meeker loan was not administered on the LPS desktop system subject to the contracts between these parties is less than credible.

43. LPS has previously testified its only compensation comes from the 'network attorneys' and the only attorneys who have access to LPS Desktop are those who have a network agreement. It is therefore unlikely that the Meeker loan was not subject to the same fee splitting conduct set out in the plaintiffs' complaint.

44. LPS' testimony on this issue is found at Vol I of William Newland's deposition at page 95:

newland61609 - Vol. I, (Page 95:13 to 95:16)

95

the only attorneys available on LPS system are attorneys who have signed a contract with LPS?

A That have signed a contract with LPS, yes.

45. As further evidence of the relationship between Wells Fargo and LPS I have attached as exhibit 6 to this affidavit is the 2010 Annual Statement of LPS filed under oath with the Securities and Exchange Commission. In pertinent part, this document provides the following admissions against interest that contradict the affidavit of Mr. Cloin:

a. Beginning at Page 1 of the Annual Report: *"Our other technology solutions include our Desktop application, which at present is deployed primarily to customers utilizing our default management services. We generally earn revenues from our Desktop application on a per transaction basis.*

b. Beginning at page 2 of the Annual Report: *Our Loan Transaction Services segment consists principally of our loan facilitation services and our default management services.... Our default management services, including title, posting and publication, property preservation, asset management and REO auction services and administrative support, are provided to national lenders, loan servicers and other real estate professionals to enable them to better manage some or all of the business processes necessary to take a loan and the underlying property through the default, foreclosure and disposition process. Our revenues from our Loan Transaction Services segment in 2010 were $1,701.5 million, or approximately 69%, of our consolidated revenues.*

c. Under the heading of "Loan Transaction Services" (which begins at the end of page 3) of the annual report the Court will find the following statement that is located on page 4 of the annual report: *Default management services.* In addition to loan facilitation services, our Loan Transaction Services segment offers default management services.[1] These services allow our customers to efficiently manage the business processes necessary to take a loan and the underlying real estate securing the loan through the default and foreclosure process. We offer a full spectrum of services relating to the management of defaulted loans, from initial property inspection through the eventual disposition of our customer's asset. Based on a customer's needs, our default management services can be provided individually or, more commonly, as part of a solution that integrates one or more of those services with our technology applications, such as the Desktop application.

d. Under the heading of Customers, the Court will find this statement: *"For example, in 2010, our largest customer, Wells Fargo Bank, N.A. ("Wells Fargo"), accounted for approximately 20.0% of our aggregate revenue and approximately 12.2% and 23.3% of the revenue from our Technology, Data and Analytics and Loan Transaction Services segments, respectively."*

46. Despite these terms in its contracts, the deposition testimony of its corporate representative and these damning statements in its 2010 annual report, LPS Default Solutions asks this Court to accept as true that ***in this individual case*** that LPS Default Solutions was not involved in administering this loan for Wells Fargo.

47. LPS makes this assertion knowing full well that just a short drive to the

[1] The Court will recall that the DSA says at page 3 of 70 that "Option One desires to enhance its overall servicing capabilities by capitalizing on Fidelity's expertise in managing defaulted and bankrupt loans…" among other statements that agree with this Annual Report.

West before Honorable Judge Elizabeth Magner, Bankruptcy Judge for the Eastern District of Lousiana, there have been many hearings which resulted in factual findings that detail extensively the involvement of LPS Default with Wells Fargo.

48. For instance, I have attached as exhibit 7 to this affidavit the decision from *In re Dorothy Chase Stewart, 391 B.R. 327; 2008 Bankr. LEXIS 2072.* In this decision Judge Magner chronicled the testimony of Kimberly Miller, Vice President in charge of Bankruptcy, Foreclosure, and the Litigation Management Department ("Bankruptcy Dept.") taken by her Court on December 4, 2007.

49. In that testimony, Kimberly Miller stated that "when a loan is involved in foreclosure, bankruptcy, or other litigation, Wells Fargo manages that loan through its Bankruptcy Department located in Fort Mill, South Carolina." Ms. Miller is the Vice President who oversees this department of 375 people. (391 B.R. *336).

50. Ms. Miller also testified that when a Borrower enters Bankruptcy and Wells Fargo's computers verify that filing that Wells Fargo's computers automatically activate a system within the Fidelity MSP software platform called a Bankruptcy Work Station ("BWS"). This sub-part of Fidelity MSP is allegedly infused with computer logic designed to manage a loan during a pending bankruptcy. (391 B.R. *337).

51. The Court then details on the balance of page 337 of the opinion the method by which the bankruptcy matter is automatically referred for legal action. Of particular import to this analysis is footnote 20 of Judge Magner's opinion noting that this process seems to be the same throughout the mortgage industry. Obviously, this is because of the grand scope of the LPS empire and the volume of the bankruptcy business that LPS controls through the DSA's with mortgage servicers of which Judge Magner was unaware when authoring the *Stewart* opinion.

52. Also, in footnote 20 of the *Stewart* opinion, Judge Magner notes that Ms. Miller represented that after Judge Magner's decision in a companion case called *Jones v. Wells Fargo, 366 B.R. 584 (Bank. E.D.La. 2007)* that Wells Fargo hired ***one firm*** to handle all of its matters involving borrowers in that state. When the Court wants to know who Wells Fargo hired in Alabama a brief review of the Court's docket will quickly reveal that the answer is Sirote.

53. Page 338 of the *Stewart* decision explains the computer programs in use by Wells Fargo and details that Fidelity's Bankruptcy Work Station becomes available to the Bankruptcy counsel and details that counsel

prepares the proof of claim[2] and is automatically notified of any postpetition default (which also agrees with the contracts submitted by counsel for the plaintiff) by the LPS computer system.[3]

54. Lest the Court have any questions about whether Sirote and Permutt, P.C. is involved in this conduct before this Court I have attached the following exhibits for the Court's consideration:

a. Exhibit 8 to this affidavit is a webpage last downloaded from Sirote's own webpage on May 30, 2011 which states under the heading "technology" that "Sirote works on a daily basis in MortgageServe and the MSP-Fidelity servicing platforms" as well as stating that "Sirote is a major participant in Direct Source programs and uses ...... FIS Desktop (LPS' system).

b. Exhibit 9 to this affidavit is another web page downloaded from the Sirote webpage on May 30, 2011 which states that Sirote's Mortgage Banking Group received the "2009 Excellence in Service" award at ***client*** Lender Processing Services' annual Attorney Summit.... The release goes on to say that "This is a select award given to those law firms that are considered in the top tier of firms in ***providing the most quality and timely service to LPS*** during the preceding 12 months."

c. Exhibit 10 to this affidavit is another web page downloaded on May 30, 2011 from the Sirote website and is the profile of Jerry E. Held who is the Chair of Sirote's mortgage banking practice group. The Court will note that Mr. Held's bio mentions that he hosts seminars and training sessions at client offices across the country. The Court will also note that his webpage indicates that he has conducted client educational training seminars in Fort Mill, South Carolina from 2007-2010. The Court surely will note that Fort Mill is the home of all of Wells Fargo's default related activities including bankruptcy according to Kimberly Miller's testimony in the *Stewart* case.

55. Despite this mountain of evidence accumulated relating to these parties ongoing relationships both LPS and Sirote filed affidavits in this case which were intended to "throw the dogs off the trail". Each of these defendants maintained that the plaintiff is simply wrong in this instance because, they testify, this loan was managed on the "Vendorscape" system, a "competitor" to LPS Default.

56. I submit to Your Honor that this representation by these parties was

---

[2] Which the Court can clearly see is actually done by LPS under the terms of the DSA and the network agreement.

[3] These findings also clearly mirror the activities set out in the contracts and testimony about the mechanics and operations of these agreements and their implementation.

known to have significance to me because these parties know that I am extremely familiar with the systems and programs used by the mortgage servicers and the default servicing industry. I submit to Your Honor that these parties believed that I would be forced to admit that Vendorscape is a known product of First American, a competitor of LPS Default, and that these parties would argue to the Court that this precluded LPS Defaults involvement in this loan.

57. I don't believe that the defendants were aware that I had in my possession a copy of the patent which allows Vendorscape to "wrap-around" LPS Desktop thereby allowing Vendorscape to further automate this process by automatically pulling the loan referral package from LPS Desktop onto Vendorscape. I have attached that patent to this affidavit as Exhibit 11.

58. This "technological advancement" allows Vendorscape to communicate with LPS Desktop and create the appearance that LPS Default is not making direct referrals to the law firm when in fact the use of Vendorscape accomplishes the very same thing in this instance. Vendorscape amounts to a "Stealth-mode" for LPS Desktop helping LPS Default attempt to avoid detection for its role in these proceedings.

59. Additionally, to remove all doubt about this relationship, I have attached as Exhibit 12 Wells Fargo's own filings from the State of New Jersey's own Judicial Inquiry into the foreclosure practices of the national mortgage servicers titled **"In the Matter of Residential Mortgage Foreclosure Pleading and Document Irregularities, in the Superior Court of New Jersey, Chancery Division-General Equity Part, Mercer County, Docket No. F-59553-10."**

60. Exhibit 12 to this affidavit is a voluminous document which is filed in six parts. In part 1 on page 5 of 83 there is a sworn certification by Timothy P. O'Brien, Senior Vice President, Wells Fargo Bank, N.A. which sets out his qualifications and explains Wells Fargo's mortgage servicing business. In pertinent part this certification provides:

   a. That Mr. O'Brien is the Manager of Default Operations, which is located in Fort Mill, South Carolina, the same place Mr. Held has taught a "client education course" for the last four years.

   b. Page 6 of 83 includes a table of contents for the certification to the New Jersey Court. Part D of the certification is an explanation of Wells Fargo's system of record, the LPS product MSP.

   c. A brief explanation of MSP begins at page 10 of 83.

   d. There is a discussion of the interaction of the software programs used

by Wells Fargo including Vendorscape on page 20 of the certification.

  e. Following Mr. O'Brien's certification there is a table of contents of attached documents which include Wells Fargo's own internal training documents. These attachments make up the balance of the remaining parts of the exhibit and pertinent portions will be highlighted individually.

61. First of all, I note that Wells Fargo bates stamped its filings in New Jersey in the format of "WF 1" etc. For ease of reference I will refer to these documents by their bates stamp number and by their volume number (1-6) of the exhibit.

62. The balance of Volume 1 through Volume 4 of this exhibit are exemplars of pooling and servicing agreements and Wells Fargo's agreements with GSE's.

63. Beginning in Volume 5 at page WF 319, there is a document titled "WFHM Affidavit Processing Training" which discusses Wells Fargo's system of record. This document indicates that MSP is used to track and manage each loan.

64. In her ruling in *In re Stewart* Judge Magner recounted as part of her findings that the MSP system opened a "Bankruptcy Work Station" that was used to manage the loan whenever a borrower entered bankruptcy.

65. What was not made clear to Judge Magner was that this work station is actually implemented through LPS Desktop which "plugs into" MSP according to the testimony I have taken from LPS.

66. It is also important to note on this same page that Vendorscape is noted to house "some of the same, but not all of, the information in MSP".

67. The next critical statement in these documents is found in Volume 5 beginning at the bottom of WF 352. This is a discussion of the judgment figures and indicates that "The judgment figures on FOR2 (a foreclosure screen in MSP) and in the Vendorscape message are the same and were created using the same application. The only difference is formatting. It is easier to read the judgment figures in Vendorscape, due to the formatting and interface in Vendorscape."

68. Another critical document in this package is found in Volume 6, at the top of the page numbered WF 444. There is a reproduction present of what LPS refers to as a "screenshot" that Wells Fargo coincidentally chose as part of its training materials. This screenshot indicates that on 11/29/10 a foreclosure was referred to Sirote in Alabama according to the line

"attorney payee" in the process notes field. More importantly, in the line immediately above that the note states "File generated for upload to LPSDESKTOP".

69. There are several reasons that these fields are significant:

   a. The first is because of the earlier testimony from *In re Stewart* that Wells Fargo has hired one firm in each state to handle its foreclosure and bankruptcy business.
   b. The second is because this entry indicates that LPS Desktop is still uploading these files when its time for referral (thus generating the responsibility under the DSA and Network Agreements for the attorney fee split to occur).
   c. This information taken in conjunction with the information from the patent application related to Vendorscape shows that LPS is loading this information into Vendorscape.

70. Additionally, I have attached as exhibit 13 to this affidavit the LinkedIn page of one Brian Woodring who identifies himself as a Vice President of Lender Processing Services and states that he managed development for LPS Desktop and that he led IT for the Wells Fargo implementation.

71. I have also attached as exhibit 14 the December 21 2009 servicer evaluation for Wells Fargo by Standard and Poors. The Court will note under the technology heading on page 6 of the exhibit that Standard and Poors reports that "Management is developing an LPS Desktop Automation Tool, which, when implemented, will improve the foreclosure and bankruptcy processes by improving existing workflow mechanisms and automating other processes."

72. Given that the plaintiff's counsel team has accumulated this much evidence of the relationships between these parties and the mechanics of how these relationships function without any formal discovery it is my belief that formal discovery will allow the plaintiff's counsel team to uncover the following material evidence which will allow the plaintiff to overcome the defendants' summary judgment motions:

   a. The agreements between Sirote and Permutt and the LPS / Fidelity entities.

   b. The local counsel agreements between Sirote and Permutt and the mortgage servicers with whom LPS enjoys a contractual relationship through a DSA.

   c. The DSA's between LPS / Fidelity and the mortgage servicers who have contracted with them.

    d. The financial records showing invoices and remittances between LPS / Fidelity and Sirote and Permutt.

    e. The testimony of these parties about these relationships including the length of the relationship and the size of the financial harm caused by the conduct.

    f. The returns on subpoenas from Wells Fargo and the deposition testimony of key Wells Fargo witnesses.

    g. The further testimony of LPS on these issues and these relationships.

73. The accumulation of this record evidence will demonstrate that these parties are in fact engaged in exactly that conduct which is alleged in the class action complaint and thereby allow the plaintiff to defeat the claims made in the summary judgment motion of the defendants.

74. Obviously, counsel for the plaintiff and the purported class has not yet been able to take formal discovery as the defendants chose the highly unusual tactic of seeking summary judgment in their initial pleading rather than filing either a motion to dismiss or an answer in this case. That tactic, while championed by the defendants as a response to a "baseless" complaint, is really nothing more than an attempt by the defendants to prevent the counsel team with the most knowledge of their contracts, conduct, actions, practices and wrongdoing from taking any discovery in any litigation against them and I ask the Court to reject this "unique" defense strategy adopted by these parties.

75. Furthermore, the plaintiffs are challenging the pattern of underlying conduct which is at issue in this case. The underlying conduct is not denied by the defendants and cannot be denied by the defendants. Therefore, even if the allegations of the defendants' motions could be substantiated under the pressure of cross examination the purported class would have the right to seek to add class representatives to cure any deficiencies in Ms. Meeker's adequacy as a class representative.

76. As lead counsel for the Plaintiff and the purported class I have asserted that this conduct represents a massive fraud on this Court. It is my contention that the Plaintiff is entitled to wide discovery to ferret out this conduct, to identify fully the extent and scope of these acts and to identity all culpable parties involved.

77. It is my contention that the Court should allow this plaintiff to identify the scope of this conduct and to join such other class representatives as are necessary to completely address the conduct alleged in the case.

78. Alternatively, I would ask the Court to consider ordering, under § 105 of the Code, the LPS defendants to disclose each mortgage servicer for whom there exists a DSA in the State of Alabama and each law firm with whom LPS has a "network agreement" and each matter in bankruptcy referred to those firms during the term of that agreement along with the documentation demonstrating those relationships.

79. I would also ask the Court to consider ordering pursuant to § 105 Sirote and Permutt to disclose the identity of each case for which it received a referral from one of the LPS defendants or any of its predecessors in interest.

80. The disclosure of this information would reveal the extent and scope of the wrongful conduct that has occurred in this Court over the term of Sirote's relationship with LPS or Fidelity.

81. The disclosure of this information would substantially expedite the proceedings and allow the parties to move forward with substantive work on the case that is focused on a merits resolution rather than engaging in wasteful motion practice.

82. Based upon this affidavit and the other evidence submitted in this case I am requesting that the Court postpone ruling on the Summary Judgment motion until such time as the Plaintiffs can take full discovery in this matter.

83. Further than this the affiant sayeth not.

NICHOLAS WOOTEN

**STATE OF ALABAMA )**
**) ACKNOWLEDGEMENT**
**LEE COUNTY )**

BEFORE ME, the undersigned, a Notary Public, personally appeared the Affiant, Nicholas Wooten, who is known to me and who being by me first duly sworn, subscribed to the foregoing Affidavit, and acknowledged before me that being duly informed of the contents of the Affidavit, he executed the same voluntarily.
WITNESS my hand and official seal of office on this the 14th day of June 2011.

NOTARY PUBLIC
STATE OF ALABAMA AT LARGE
My commission expires: MY COMMISSION EXPIRES OCT. 22, 2012